TNT USA INC and TNT Holdings B.V., Plaintiffs,

v.

TRAFIEXPRESS, S.A. DE C.V., Grupo Trafimar, Willy T. Toedtli and Kevin Eggart, Defendants.

No. 05–21837 CIV MORENO.

United States District Court, S.D. Florida, Miami Division.

April 3, 2006.

Gary A. Stahl, King Pagano Harrison, New York, NY, Jeffrey W. Pagano, Curtis Bradley Miner, Colson Hicks Eidson, Coral Gables, FL, for Plaintiffs.

John Joseph Quick, Jose Salvador Talavera, Joseph Hyam Serota, Weiss Serota Helfman Pastoriza et. al., Miami, FL, for Defendants.

*ORDER DENYING DEFENDANTS'*
*MOTION TO DISMISS AMENDED*
*COMPLAINT*

MORENO, District Judge.

Plaintiffs bring this action for trademark infringement, breach of contract, and related theories of relief against the Defendants. Presently before the Court is Defendants TrafiExpress, S.A. de C.V., Grupo Trafimar, and Willy T. Toedtli's Motion to Dismiss the Amended Complaint (D.E. No. 12), filed on *September 21, 2005.* Plaintiffs filed their response on *November 2, 2005,* and the Defendants filed their reply on *November 14, 2005.* Individual Defendant Kevin Eggart's Adoption of the Motion to Dismiss the Amended Complaint was filed on *December 14, 2005.* For the reasons set forth below, the Defendants' motion to dismiss is DENIED.

## I. BACKGROUND

Plaintiff, TNT Holdings B.V. ("TNT Holdings"), is a Dutch company incorporated in the Netherlands that operates a global system of express international parcel delivery, TNT Holdings is also engaged in the business of handling and arranging for the transportation and delivery of large quantities of bulk international mail. To complete its international network, TNT relies on a series of affiliated companies, such as Plaintiff TNT USA, Inc. ("TNT"), as well as local providers to handle deliveries abroad. Defendant TrafiExpress, a corporation organized and existing under the laws of Mexico, is one of these local providers relied upon by TNT. TrafiExpress is a subsidiary of Defendant Grupo Trafimar, a corporate parent company similarly incorporated in Mexico and operated by Defendant Willy T. Toedtli ("Toedtli"), a citizen of Mexico who resides in or near Mexico City, and Defendant Kevin Eggart ("Eggart"), a citizen of the United States who currently resides in or near Miami, Florida.

### A. Joint Operating Agreement between TNT and TrafiExpress

In order to develop its business in Mexico and better compete with other providers in the Mexican market, TNT entered into a business relationship with TrafiExpress in July 1999. The goal was to increase TNT's express parcel sales and to make the "TNT" brand recognizable in Mexico for express delivery of international parcels, TNT and TrafiExpress entered into a Joint Operating Agreement ("JOA") which provided that TrafiExpress would operate as TNT's exclusive agent for the delivery of TNT's international parcels destined for Mexico. In addition, the JOA provided that TrafiExpress would act as TNT's exclusive agent for the pick-up and preparation of "outbound" express packages originating in Mexico for uplift to TNT's Miami hub and subsequent delivery in the United States and abroad.

### B. License Agreement between TNT Holdings and TrafiExpress

Included in the JOA was a License Agreement between TNT Holdings and TrafiExpress. This License Agreement granted TrafiExpress the non-exclusive right to use the distinctive "TNT" trademark and other related marks in connection with the performance of its duties as TNT's agent under the JOA. The "TNT" trademark and other related marks are duly registered under the laws of the United States and Mexico, and are owned by TNT Holdings. The License Agreement expressly prohibited TrafiExpress from li-

censing any of the TNT-related marks to any other person or entity without TNT Holdings' prior written consent. In addition, the License Agreement required TrafiExpress to submit all literature, stationary, advertising and other materials that incorporated the "TNT" mark to TNT Holdings prior to making any use of the mark in any such materials.

### C. Alleged Violation of the Joint Operating Agreement

From mid 1999 to 2005, TrafiExpress operated as TNT's exclusive agent in Mexico and worked closely with TNT's Latin American hub, located in Miami. TrafiExpress coordinated its services with TNT by sending personnel to Miami in order to learn TNT's shipment protocols, its proprietary systems, and the process of moving international parcels. Pursuant to the JOA, TrafiExpress also received, processed, sorted, and delivered TNT express parcels that arrived in Mexico through the Miami hub.

However, TrafiExpress' conduct regarding outbound parcels allegedly failed to adhere to the company's JOA with TNT. Although TrafiExpress was TNT's exclusive agent for express parcels that originated in Mexico, TNT claims TrafiExpress failed to ship a significant portion of outbound parcels it collected within the TNT network. Rather than utilize TNT's network, TrafiExpress allegedly shipped packages to customers in the United States using TNT's American-based competitors, such as the United Parcel Service (UPS). According to TNT's Complaint, during the first half of 2005, TrafiExpress shipped approximately 4900 parcels with TNT's American competitors, thereby breaching the JOA and depriving TNT of business and profits.

### D. Trafimar's Use of the TNT Trademark on the Web

Beginning in or about 2004, defendants allegedly caused TNT's trademark and TNT's related marks to be posted on Trafimar's internet web site, which Trafimar utilizes to attract customers in the United States and elsewhere. Trafimar's web site appears in both Spanish and English versions, and both versions are accessible in the United States and around the world. Plaintiffs' complaint states that TNT's trademark appeared in the Spanish version of Trafimar's main web page, while TNT's trademark and related marks were utilized on other web pages within Trafimar's website.

Allegedly included within these webpages on Trafimar's site are purported descriptions of TNT's "General Information," TNT's "Worldwide Philosophy," TNT's "Latin American and Caribbean" services, and other information that conveys the look and appearance that the information originated from TNT and was approved for use by TNT. However, TNT argues that various statements found on these webpages concerning TNT are inaccurate. Plaintiffs' complaint states that at no time did Trafimar or TrafiExpress seek to obtain the approval of TNT Holdings or TNT for the use of the "TNT" trademark and related marks on Trafimar's web pages. Plaintiffs allege that both Toedtli and Eggart caused the "TNT" mark and related promotional materials to be posted on Trafimar's web pages, and knew of and approved the inaccurate literature and advertising relating to TNT.

### E. Termination of the Joint Operational Agreement by TNT

On or about May 30, 2005, TNT states that it decided to terminate the JOA under

Section 4.4, which provides that either party may end the relationship, for any reason, upon 30 days' written notice. According to the complaint, TrafiExpress reacted to TNT's termination by serving a number of written notices upon several of TNT's worldwide offices asserting that under Mexican law and provisions of the Mexican Constitution, TNT could not exercise its express, agreed-upon right to terminate the JOA set forth in Section 4.4. In addition, TrafiExpress asserted that as a result of TNT's notice of termination. TrafiExpress was entitled to recover $48 million in alleged damages from TNT-despite Section 7 of the JOA, which provides that neither party shall be liable to the other for any special, economic, or consequential loss suffered by that party.

Because TNT states that initial notice of termination sent on May 30, 2005 did not adhere to Section 4.4 specifications under the JOA, TNT sent another letter in late June 27, 2005 providing notice to TrafiExpress that the JOA would terminate upon no less than 30 days notice (pursuant to Section 4.4 of the JOA). The letter was delivered by hand to TrafiExpress' offices in Mexico City, thereby setting the termination date as July 30, 2005. Notwithstanding this letter of termination, Plaintiffs claim that TrafiExpress responded via letter that it would continue its operations, including its use of the "TNT" mark. According to the complaint, TrafiExpress also asserted once again that ending the parties' relationship in the manner set forth in the JOA violated provisions of the Mexican Constitution, the Mexican Civil Code, and the Mexican Code of Commerce, and reiterated the company's right recover $48 million in alleged damages from TNT.

### F. Plaintiffs' Amended Complaint

Plaintiffs allege that TrafiExpress continues to engage in the express parcel business in Mexico and conducts business with other companies, some of which are TNT's competitors. Plaintiffs also claim that despite termination of the JOA, TrafiExpress continues to use the TNT mark and related materials. Plaintiffs' Amended Complaint seeks relief based on eleven counts. Count 1 requests damages under the Lanham Act for "unpaid royalties and unauthorized use of the 'TNT' mark." Count 2 seeks injunctive relief under the Lanham Act based upon substantially the same allegations. Counts 3 and 4 are based on alleged breach of contract and seek reimbursement for unpaid royalties and the return of promotional TNT materials. Count 5 is a claim for conversion of profits for the alleged misuse of the TNT mark. Counts 6 and 7 seek damages based on unjust enrichment for the alleged misuse of the TNT mark and improper use of TNT's trace-and-track system. Count 8 requests damages for tortious interference with a business relationship premised on the acts of independent Mexican governmental and labor organizations. Count 9 is a prayer for declaratory judgment as to the effect of Mexican law. Count 10 requests an order requiring TrafiExpress to specifically perform under the termination clauses of the contract. The final count, Count 11, is premised on substantially the same acts as Count 8, but seeks relief under the theory of commercial disparagement.

## II. LEGAL STANDARD

A court will not grant a motion to dismiss unless the plaintiff fails to allege any facts that would entitle the plaintiff to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Bradberry v. Pinellas County*, 789 F.2d 1513, 1515 (11th Cir.1986). When rul-

ing on a motion to dismiss, a court must view the complaint in the light most favorable to the plaintiff and accept the plaintiff's well-pleaded facts as true. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am.,* 795 F.2d 948, 953 (11th Cir.1986).

## III. ANALYSIS

In their Motion to Dismiss, defendants argue that the facts of this case do not permit the extraterritorial application of the Lanham Act, and therefore this court does not have subject matter jurisdiction over the plaintiffs' trademark infringement claims. Defendants argue that not only is this case subject to dismissal for lack of subject matter jurisdiction, but also claim the case should be dismissed pursuant to the doctrine of *forum non conveniens* because all eleven counts of the Amended Complaint are based upon acts occurring in Mexico and under Mexican law.

## A. Extraterritorial Applicability of the Lanham Act and Subject Matter Jurisdiction

■ A federal court may "dismiss a federal question claim for lack of subject matter jurisdiction only if (1) the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction; or (2) such a claim is wholly insubstantial and frivolous." *Blue Cross & Blue Shield of Alabama v. Sanders,* 138 F.3d 1347, 1352 (11th Cir.1998) (quoting *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946)). Analysis of the extraterritorial applicability of the Lanham Act, 15 U.S.C. § 1051 *et seq.,* is required to determine whether the Court possesses subject matter jurisdiction in this case.

■ The Supreme Court has held that the Lanham Act confers jurisdiction over extraterritorial disputes involving trademark infringement and unfair competition when: 1) Defendant is a United States corporation; 2) the foreign activity had substantial effects in the United States; and 3) exercising jurisdiction would not interfere with the sovereignty of another nation. *Steele v. Bulova Watch Co.,* 344 U.S. 280, 286–87, 73 S.Ct. 252, 97 L.Ed. 319 (1952); *Int'l Cafe, S.A.L. v. Hard Rock Cafe Int'l (U.S.A.), Inc.,* 252 F.3d 1274, 1278 (11th Cir.2001). In applying this three-part test, "the absence of one of the [Bulova] factors might well be determinative and. . .the absence of both is certainly fatal." *Vanity Fair Mills, Inc. v. T. Eaton Co.,* 234 F.2d 633, 640 (2nd Cir.1956); *Int'l Cafe,* 252 F.3d at 1278 (adopting the Court's reasoning in *Vanity Fair* ).

### 1) Defendants include a United States citizen

In this case, a majority of the defendants are Mexican citizens: Trafimar and TrafiExpress are Mexican corporations, while Toedtli is a citizen of Mexico. However, the presence of defendant Kevin Eggart, a United States citizen, appears to satisfy the first element under *Bulova.* Although Eggart is not a United States corporation as stated in the first prong of the *Bulova* test, his control of TrafiExpress' activities within the United States from Miami, Florida undoubtedly strengthens the plaintiffs' case for extraterritorial application of the Lanham Act. Moreover, despite being headquartered in Mexico City, TrafiExpress' extensive use of TNT's Miami hub to conduct substantial business with customers inside the United States also furthers the applicability of the Lanham Act in this case.

### 2) Substantial effect within the United States

Through its connection with TNT's Miami hub, TrafiExpress has clearly exerted a

significant effect upon United States commerce, thereby satisfying the second element of the *Bulova* test. TrafiExpress meets the second prong in two distinct ways: (1) Through actual misuse of the TNT trademark in United States commerce and (2) through its website, which continues to identify TrafiExpress as an agent of TNT. Bach of these uses of the TNT trademark by TrafiExpress shall be addressed in turn.

### A. Use of the TNT trademark in the United States

In the Amended Complaint, plaintiffs have pointed out several ways in which TrafiExpress has dealt continuously with the American market:

- Defendants handled plaintiffs' shipments from the United States, and regularly shipped parcels to TNT's hub in Miami.

- Defendants regularly shipped freight, cargo, and household goods to and from the United States, including the Port of Miami—with TNT's American competitors.

- During the first five and a half months of 2005, TrafiExpress shipped nearly 8,500 international express parcels from Mexico through TNT's Miami hub and then into the United States, amounting to nearly 15 tons of material.

- Defendants worked closely with TNT's Miami facility; TrafiExpress personnel traveled to Miami in order to be trained with respect to TNT's shipment protocols, its proprietary systems and the process of moving international parcels through Miami.

These examples of TrafiExpress' involvement in the U.S. market disprove defendants' claim that the reach of its business activities and trademark use are limited to Mexico alone.

In addition to the aforementioned activity, it is also important to note TrafiExpress' use of TNT competitors to ship 4,900 parcels to customers within the United States as stated in the Amended Complaint. By allegedly breaching the JOA and utilizing TNT's competitors to deliver packages around the country, TrafiExpress' unapproved use of the TNT trademark could adversely affect TNT's trade reputation in the United States. Allowing TrafiExpress to ship packages under the TNT label to customers with the help of TNT's very own competitors prevents TNT from regulating the use of its trademark and creates a likelihood of confusion amongst customers as to the source of packages affixed with the TNT label. *See Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1193 (11th Cir.2001) (explaining that "likelihood of confusion" analysis includes a "source or sponsorship test" to protect use of a mark that would "reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner") (quoting J. McCarthy, § 24:6); *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 106 F.3d 355, 360 (11th Cir.1997) (discussing the factors used in assessing whether or not a likelihood of consumer confusion exists).

■ As in *Bulova*, the effects of defendants' activities in this case are not confined within the territorial limits of a foreign nation. TrafiExpress' involvement in United States commerce is clear, its use of the TNT trademark has extended beyond the Mexican border and therefore the plaintiffs' trade reputation is affected in

markets cultivated by advertising in the United States. Therefore, defendants' actions fall under the purview of the Lanham Act, especially since TrafiExpress' allegedly misappropriated the TNT trademark within the United States, by using it in dealing with TNT's competitors.

In its reply, TrafiExpress argues that since the JOA did not permit them to deliver TNT packages outside of Mexico, its actions effectively ended at the Mexican border. However, accepting the plaintiffs' well-pleaded facts as true, TrafiExpress did allegedly misappropriate the TNT trademark and breach the JOA by shipping packages to locales within the United States through TNT's competitors. TrafiExpress also argues that even if it did prepare packages which ultimately traveled through Miami, this is insufficient to warrant the extraterritorial application of the Lanham Act. However, this link is not insufficient when compared to the petitioner's actions in *Bulova*. In *Bulova*, a United States citizen purportedly manufactured and sold counterfeit watches in Mexico, allegedly infringing upon the United States trademark of a United States corporation. The effects were not confined to Mexico however, as the court noted that both parties were American, U.S. components were used in the watches, and that sometimes the watches were repaired at U.S. jewelers. *See Steele v. Bulova Watch Co.*, 344 U.S. 280, 284–85, 73 S.Ct. 252, 97 L.Ed. 319 (1952).

The *Bulova* court found these effects to be substantial in nature, and in the case at bar, the effects of TrafiExpress' business are similarly felt beyond the borders of Mexico. First, the plaintiff owning the TNT trademark is a subsidiary incorporated in the United States, while one of the principle decision-makers behind the corporate defendants is a U.S. citizen residing in Miami, Florida, Second, the packages shipped by TrafiExpress reach consumers in the United States through TNT's Miami hub, a shipping point that defendants have in some instances used to capture TNT's profits by dealing with rival delivery companies. And third, the defendants have not only shipped their packages throughout the United States, but also brought personnel to the United States for training, directly advertised in the United States., and solicited business within the United States. Thus the effects of TrafiExpress' business are clearly as substantial as those of the petitioner in *Bulova*, who didn't even directly engage United States customers as TrafiExpress did.

In this case defendants' actions namely the alleged delivery of 15 tons of material through TNT's Miami office in the first five and half months of 2005–have exerted a sufficient effect on interstate commerce for subject matter jurisdiction to attach. This conclusion is not only supported by the Supreme Court's holding in *Bulova*, but also by Eleventh Circuit case law, which has repeatedly found the Lanham Act extraterritorially applicable where some component of the alleged infringement has taken place within the United States. *See Levi Strauss & Co. v. Sunrise International Trading, Inc.*, 51 F.3d 982, 985 (11th Cir.1995) (finding subject matter jurisdiction despite the fact that the counterfeit jeans at issue were manufactured outside the United States and not intended for sale here; the court in *Levi Strauss* based its holding on several factors, including the shipment of the counterfeit jeans through the United States on their way to Europe, and the United States residence of the individual defendants); *Babbit Electronics v. Dynascan Corp.*, 38 F.3d 1161, 1179 (11th Cir.1994) (finding an effect on

interstate commerce and applicability of the Lanham Act to sales of telephones conducted exclusively outside the United States where materials were, as in the case at bar, shipped through United States territory).[1]

### B. TrafiExpress' Website

The Eleventh Circuit has held that activities conducted exclusively over the Internet can affect interstate commerce sufficiently for subject matter jurisdiction to attach. In *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1193 (11th Cir.2001), the Eleventh Circuit held that the distribution of software over the Internet satisfied the Lanham Act's "use in commerce" jurisdictional predicate. The Eleventh Circuit based its reasoning in *Planetary Motion*, in part, on the holding of *Planned Parenthood Fed'n of Am., Inc. v. Bucci*, finding that "[t]he nature of the Internet indicates that establishing a typical home page on the Internet, for access to all users, would satisfy the Lanham Act's 'in commerce' requirement." *Id.* at 1195 (quoting *Planned Parenthood Fed'n of Am., Inc. v. Bucci*, 1997 WL 133313 (S.D.N.Y.1997)); *see also Shatel Corp. v. Mao Ta Lumber and Yacht Corp.*, 697 F.2d 1352, 1356 (11th Cir.1983) (stating that "[a]dvertising that affects interstate commerce and solicitation of sales across state lines or between citizens of the United States and citizens and subjects

of a foreign nation is...commerce within the meaning of the Lanham Act").

The Court's holding in *Planetary Motion* illustrates that the Lanham Act's "use in commerce" predicate is far easier to satisfy when the internet presence is coupled with actual infringement. The Eleventh Circuit clarified this point in its recent decision, *Bond v. Ivy Tech State College*, 2006 WL 306046 (11th Cir.2006). In *Bond*, the court emphasized that it has "[n]ever...addressed the question of whether the more existence of a website that is visible in a forum, by itself, confers jurisdiction over the site's owner." The Eleventh Circuit went on to point out that other circuits have found such circumstances insufficient to confer jurisdiction. *Bond*, 2006 WL 306046, at *2 (citing *McBee v. Delica Co., Ltd.*, 417 F.3d 107, 124 (1st Cir.2005) (holding that "[t]he mere existence of a website does not show that a defendant is directing its business activities towards every forum where the website is visible")).

Defendants cite *Bond* as proof that the presence of TrafiExpress' website alone is insufficient to establish subject matter jurisdiction. In this case, however, the plaintiffs are *not* attempting to obtain subject matter jurisdiction solely through TrafiExpress' website and its alleged solicitation of American customers. Instead, the basis for subject matter jurisdiction is the combination of TrafiExpress' website

---

1. Even if the Court were to accept defendants' argument that infringement never extended beyond the Mexican border and no wrongful conduct transpired in the United States, the Lanham Act may still apply. In *American Rice v. Arkansas Rice Growers Co-Operative Assoc.*, the Fifth Circuit ruled that extraterritorial conduct still produced a sufficient effect on interstate commerce, without requiring any showing of a substantial effect. *American Rice, Inc. v. Arkansas Rice Growers Co-Opera-*

*tive Assoc.*, 701 F.2d 408, 414 n. 8 (5th Cir. 1983); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc) (adopting as binding precedent all decisions handed down by the former Fifth Circuit prior to October 1, 1981). Even though all of the infringing activity occurred in Saudi Arabia, the Court in *American Rice, Inc.* found a sufficient basis for subject matter jurisdiction. *Id.* at 414–415.

with the defendants' alleged use of the TNT trademark to facilitate deliveries into the United States. Plaintiffs need not demonstrate actual use of the TrafiExpress website by American consumers, or prove that the site has led to actual sales. By relying on both an internet presence and allegations of actual infringement, TNT makes clear that a likelihood of confusion over source and sponsorship does exist that may very well endanger the goodwill associated with TNT's trademark. Therefore, viewing the complaint in the light most favorable to the plaintiffs and accepting the plaintiffs' well-pleaded facts as true, defendants' website helps strengthen plaintiffs' overall case for the extraterritorial application of the Lanham Act.

## B. Forum Non Conveniens

■ At its discretion, a court may dismiss a case for *forum non conveniens* "when trial in the chosen forum would establish ... oppressiveness and vexation to a defendant ... out of all proportion to plaintiff's convenience, or when the chosen forum [is] inappropriate because of consideration affecting the court's own administrative and legal problems." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 249, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). Furthermore, "dismissal will ordinarily be appropriate where trial in the plaintiff's chosen forum imposes a heavy burden on the defendant or the court and where the plaintiff is unable to aver any specific reasons of convenience supporting its choice." *Id.; see also Burt v. Isthmus Development Co.*, 218 F.2d 353, 356 (5th Cir.1955) (holding that "courts should require positive evidence of unusually extreme circumstances and should be thoroughly convinced that material injustice is manifest before exercising any such discretion to deny a citizen

access to the courts of this country."); *SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.*, 382 F.3d 1097, 1099, 1100, 1003 (11th Cir.2004).

■ In a motion to dismiss for *forum non conveniens*, the movant must show that "(1) an adequate alternative forum is available, (2) the public and private factors weigh in favor of dismissal, and (3) the plaintiff can reinstate his suit in the alternative forum without undue inconvenience or prejudice." *Leon v. Million Air, Inc.*, 251 F.3d 1305, 1311 (11th Cir.2001). The above factors are balanced with the court looking at the advantages and the disadvantages of each forum and with no one factor controlling. *See Warter v. Boston Securities, S.A.*, 380 F.Supp.2d 1299, 1306 (S.D.Fla.2004). When analyzing the private and public factors, however, the private factors are considered first. *See SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.*, 382 F.3d 1097, 1100 (11th Cir.2004). If the private factors are found to be "equipoise or near equipoise" then the Court will turn to the public factors to tip the balance. *Id.*

### 1) Deference to Plaintiffs' Choices of Forum

■■ In a *forum non conveniens* inquiry, courts show deference to a plaintiff's choice of forum. *See SME Racks, Inc.*, 382 F.3d at 1101 (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947)). This presumption for the plaintiff's choice is strongest when the plaintiff is a United States citizen, resident, or corporation. *Id.* In fact, a material injustice must manifest before a court can deny a United States citizen access to a United States court. *Id.* A foreign plaintiff's choice of forum, however, is a weaker presumption and receives far less defer-

ence. *See Leon v. Million Air, Inc.*, 251 F.3d 1305, 1311 (11th Cir.2001).

In this case, the main plaintiff is TNT USA, Inc. ("TNT"), a Delaware corporation with an office in Miami. Therefore, in the following *forum non conveniens* analysis, TNT's choice of forum will receive a high level of deference and a presumption of convenience. The other plaintiff, TNT Holdings B.V. ("TNT Holdings"), is a Dutch company incorporated in the Netherlands. However, the fact that TNT Holdings is a Dutch corporation has little effect upon the deference that must be given to the choice of forum made by TNT USA. TNT Holdings voluntarily commenced suit in the United States in order to enforce the rights it holds in the TNT trademark, and seeks to protect this mark's ability to generate a significant amount of business in the United States.

### 2) An Adequate Forum

■■■ "An adequate forum need not be a perfect forum" however, the forum must afford a satisfactory remedy. *Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279, 1283 (11th Cir.2001); *see also Warter*, 380 F.Supp.2d at 1307 (holding that an alternative forum is inadequate if the remedy it affords is "clearly unsatisfactory" or is "essentially no remedy at all"). A forum is adequate even though it provides a remedy that would be substantially less than the remedy in the United States. *See Sigalas v. Lido Maritime, Inc.*, 776 F.2d 1512, 1519 (11th Cir.1985). Furthermore, an adequate forum is usually found when "the defendant is amenable to process in that other forum." *Satz*, 244 F.3d at 1283. Differences in law and procedure do not make the forum inadequate.

■■■ In this case, defendants are willing to submit to jurisdiction in Mexico and are amenable to process in Mexico. Plaintiffs argue, however, that given individual defendant Eggart's American citizenship and Miami residence, he is not amenable to process in Mexico, while defendant Toedtli, despite being a Mexican citizen, does maintain a residence in Key Biscayne, Florida. Furthermore, the corporate defendants in this case, despite maintaining headquarters in Mexico City, conduct a significant portion of their international business in American markets. Therefore it appears that three defendants have substantial contacts with the United States, while one of the defendants is an American citizen. Accordingly, this Court believes that the United States would serve as an equally adequate forum, especially since the case deals in part with TNT's trademark in the American market. There is simply little to no legal or practical reason to seek redress for the alleged injuries from a Mexican court.

### 3) Private and Public Interest Factors

■■■ The Supreme Court has outlined a number of factors for courts to consider in a *forum non conveniens* determination. These factors, however, are not exhaustive or dispositive and the Court is free to be flexible in responding to cases as they are presented. *See Sigalas*, 776 F.2d at 1519. The private interest factors include (1) ease of access to sources of proof and evidence, (2) availability and costs of obtaining willing and unwilling witnesses, and (3) "all other practical problems that make the trial of the case easy, expeditious and inexpensive." *Gilbert*, 330 U.S. at 508, 67 S.Ct. 839. If the private interest factors are at equipoise, the Court will also consider the following public interest factors: "(1) the sovereigns' interests in deciding the dispute, (2) the administrative burdens posed by trial, and (3) the need to

apply foreign law." *Warter*, 380 F.Supp.2d at 1314 (quoting *Satz*, 244 F.3d at 1284).

### A. Private Factors

The analysis of private factors begins with the case of access to evidence and availability of witnesses. Defendants claim that "almost all of the evidence" and the "relevant sites" are located in Mexico, but have failed to articulate what key evidence and what key sites are actually found in Mexico. The evidence in this case consists primarily of the parties' written agreement (in English). TNT's termination letter (also in English), and the improper usage of TNT's trademark, which can be displayed and printed from a computer with an Internet connection. It appears the most important "site" is defendant Trafimar's website, and there is no need to be in Mexico to view the website. The only other situs of any consequence is TNT's Miami hub, which defendants used to conduct a substantial amount of business in early 2005.

Defendants assert that almost all of the "key witnesses" are located in Mexico, including individuals from the Mexican Board of Settlement and Arbitration, the Mexican Chamber of Deputies, Mexico's Attorney General office, TNT's "new agent" in Mexico, and the Mexican labor union overseeing the employees of TNT's "new agent." However, these witnesses listed by the defendants are at best tangentially related to Plaintiffs' claims. Moreover, defendants have not explained why the location of these witnesses is truly an impediment to the prosecution of the action before this Court. Defendant Kevin Eggart lives and works in Florida. Defendant Willy Toedtli maintains a reside in Key Biscayne. Most, if not all, the remaining witnesses on defendants' side are employees of Trafimar or TrafiExpress, and such witnesses are under the control of those defendants. Accordingly, any such witnesses must be produced for deposition pursuant to Rules 26 and 30. Logistically speaking, conducting depositions of these witnesses in Mexico City is not burdensome, and traveling to Mexico to conduct a deposition does not amount to a valid reason to dismiss this action.

In addition to the absence of any witness or evidence-related problems, there are also no practical concerns or expense related issues preventing the Southern District of Florida from serving as an adequate forum. Two out of the four defendants have a presence in this district, and the corporate defendants do business in American markets. Thus it is hardly burdensome to litigate in Miami, which is only a plane ride away from any witnesses or records under defendants' control that may be located in Mexico City.

### B. Public Factors

The Eleventh Circuit has stated that public interest factors include (a) Court congestion and jury duty generated by matters with no relation to the forum; (b) the desirability of deciding localized controversies at home; (c) and conflict-of-law problems and difficulties applying foreign law. *See C.A. La Seguridad v. Transytur Line*, 707 F.2d 1304, 1307 (11th Cir.1983). "The need to resolve and apply foreign law should 'point the trial court towards dismissal.'" *Sigalas*, 776 F.2d at 1519 (quoting *Piper*, 454 U.S. at 260, 102 S.Ct. 252). Dismissal is warranted so that events occurring on foreign land are adjudicated by foreign courts, especially where the foreign court has already adjudicated similar issues. *See Ford*, 319 F.3d at 1310; *see*

*also Piper,* 454 U.S. at 260, 102 S.Ct. 252 (holding that there is "a local interest in having localized controversies decided at home"). Furthermore, the Supreme Court has held that courts are better off applying the laws with which they are familiar. *See Piper,* 454 U.S. at 260, 102 S.Ct. 252; *see also Magnin v. Teledyne Continental Motors,* 91 F.3d 1424, 1430 (11th Cir.1996) (holding that since French substantive law applied, it would be "far better that the case be tried in France by one or more jurists" who are familiar with French law).

In this case, nearly all claims are premised upon American law, and a considerable amount of underlying activity occurred in the United States. Nevertheless, defendants argue that interpretation of the Mexican Civil Code, the Mexican Constitution, and the Mexican Code of Commerce is be necessary to determine the merits of plaintiffs' claims.[2] This Court finds, however, that these sources of foreign law are largely inapplicable to plaintiffs' Amended Complaint.

With regards to plaintiffs' claims under the Lanham Act, TNT has the right to invoke American trademark law in this forum to protect its mark and the business which that mark generates in the United States. There is no question that this forum is well-suited to address TrafiExpress' alleged unauthorized use of the TNT trademark. *See Bulova,* 344 U.S. at 280, 282, 73 S.Ct. 252 (holding that international comity does not preclude subject matter jurisdiction); *Levi Strauss,* 51 F.3d at 985 (finding that international comity does not prohibit the extraterritorial application of the Lanham Act); *see also* Paris Convention for the Protection of Industrial Property of 1883 (in force in Mexico since September 7, 1903 and preventing Mexican and American copyright and trademark laws from being in conflict by expressly affording international protection to service marks such as those at issue here).

As for Plaintiffs' non-Lanham Act claims, they include TNT's ability to enforce the JOA's termination provision and TNT's right to determine who will send parcels into the United States through their Miami hub. These contractual provisions may be properly adjudicated in this forum, and even if foreign law were to play a role in interpreting contract provisions between the parties, this alone is not enough to take away TNT's ability to litigate the case here in the United States. *See SME Racks, Inc.,* 382 F.3d at 1104–05 (finding that "while the application of foreign law is an important factor to be considered in weighing the public interests, this factor cannot be accorded dispositive weight."); *Burt v. Isthmus Development Co.,* 218 F.2d 353, 358 (5th Cir.1955) (finding the need to apply foreign law to decide a controversy does not amount to a sound reason to dismiss the case).

## IV. CONCLUSION

For all the foregoing reasons, this Court finds the Lanham Act extraterritorially applicable in this case, and holds that under the doctrine of *forum non conveniens,* the plaintiffs' chosen forum is proper and appropriate. Accordingly, defendants' Motion to Dismiss the Amended Complaint (D.E. No. 12) is DENIED.

---

2. Defendants also assert that matters alleged in the Amended Complaint are currently proceeding before the Mexican Board of Settlement and Arbitration, the Mexican Chamber of Deputies and Mexico's Attorney General. Defendants offer no support, however, for these assertions and state in their brief only that there "may be a source of potential conflict." Such assertions are insufficient to warrant dismissal.