# United States Court of Appeals
## For the First Circuit

No. 05-1774

ALAN NISSELSON, TRUSTEE OF THE DICTAPHONE
LITIGATION TRUST,

Plaintiff, Appellant,

v.

JO LERNOUT ET AL.

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Selya, Lipez and Howard,
Circuit Judges.

Max Folkenflik and Regina Griffin, with whom Folkenflik &
McGerity, Brauner Baron Rosenzweig & Klein, Karen D. Hurvitz, and
Law Offices of Karen D. Hurvitz were on brief, for appellant.
George A. Zimmerman, with whom Matthew J. Matule and Skadden,
Arps, Slate, Meagher & Flom LLP were on brief, for appellee SG
Cowen and Company, LLC.
Janet B. Fierman, with whom Thomas W. Evans, Robert M. Cohen,
and Cohen & Fierman, LLP were on brief, for appellee Mercator
Assurances, S.A.
Robert J. Kaler, with whom Eric Neyman and Gadsby Hannah LLP
were on brief, for appellees Flanders Language Valley Fund et al.
Michael P. Carroll, with whom Michael S. Flynn, Sean C.
Knowles, Phineas E. Leahey, Davis Polk & Wardwell, Kevin J.

Lesinski, William J. Hanlon, Kristin G. McGurn, and Seyfarth Shaw LLP were on brief, for appellee KPMG LLP.

Thomas J. Gallitano, Conn, Kavanagh, Rosenthal Peisch & Ford LLP, John B. Missing, Ada Fernandez Johnson, and Debevoise & Plimpton LLP on brief for appellee GIMV, N.V.

Michael J. Stone, Peabody & Arnold LLP, George A. Salter, Nicholas W.C. Corson, and Hogan & Hartson LLP on brief for appellee Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren.

Robert P. Trout, John Thorpe Richards, Jr. and Trout Cacheris, PLLC on brief for appellee Lessius Management Consulting, N.V.

Andrew Good, Good & Cormier, Roger E. Zuckerman, Steven M. Salky, P. Andrew Torrez, and Zuckerman Spaeder LLP on brief for appellee Louis-H. Verbeke.

————————————

November 8, 2006

————————————

**SELYA**, <u>Circuit Judge</u>.  This appeal requires us to explore an arcane corner of the world of corporate finance.  In the underlying series of events, a corporate shark, using fraudulent means, induced an allegedly innocent target corporation to enter into an ill-advised merger.  After both the shark and the merged entity drowned in red ink, plaintiff-appellant Alan Nisselson (the trustee), appointed by the bankruptcy court to prosecute any causes of action that the merged entity might possess, attempted to mount various claims arising out of the innocent target's legal rights.  Those rights, of course, were twice removed from the damages that formed the basis of the suit: they were passed along once to the surviving corporation (at the time of the merger) and again to the trustee (during the bankruptcy proceedings).

Emphasizing this genealogy, the district court dismissed the action on two grounds; it determined that the trustee lacked standing to pursue the claims and that, in all events, the rascality of the shark was as a matter of law imputed to the surviving entity in the merger (and that, therefore, the hoary in pari delicto doctrine barred the suit).  <u>See</u> <u>Nisselson</u> v. <u>Lernout</u>, No. 03-10843, 2004 U.S. Dist. LEXIS 28655, at *20-21 (D. Mass. Aug. 9, 2004).  Concluding, as we do, that the second of these determinations withstands scrutiny — the trustee's claims are incurably tainted because they derive from the itself-complicit surviving corporation — we affirm the judgment below.

-3-

## I. BACKGROUND

We glean the pertinent facts from the amended complaint, supplementing those facts as needed by documents fairly incorporated therein and matters susceptible to judicial notice. See Centro Medico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 5 (1st Cir. 2005); In re Colonial Mortg. Bankers Corp., 324 F.3d 12, 15-16 (1st Cir. 2003). While the scheme that lies at the center of this case comprises a complex tale of sophisticated financial chicanery, we rehearse here only those features essential to an understanding of the present proceeding. We urge the reader who thirsts for greater knowledge to consult the array of published opinions emanating from related litigation. See, e.g., Baena v. KPMG LLP, 453 F.3d 1 (1st Cir. 2006); Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren, 361 F.3d 11 (1st Cir. 2004); Bamberg v. SG Cowen, 236 F. Supp. 2d 79 (D. Mass. 2002); Filler v. Lernout, 230 F. Supp. 2d 152 (D. Mass. 2002); In re Lernout & Hauspie Sec. Litig., 208 F. Supp. 2d 74 (D. Mass. 2002).

By the time the new millennium dawned, Dictaphone Corporation (Old Dictaphone), a company chartered under the laws of Delaware, had established itself as a force in the healthcare speech and language applications market. Lernout & Hauspie, N.V. (L&H), a Belgian corporation that ran its United States operations from headquarters in Massachusetts, was itself an international leader in various speech and language sectors. In hopes of swallowing up its

-4-

competitor, L&H began courting Old Dictaphone; it described in glowing terms its financial stability and the profitable synergies that a merger could generate. Negotiations ensued.

Not surprisingly, Old Dictaphone conducted extensive due diligence investigations into L&H's fiscal health. During the course of that review, L&H's senior officers, investment bankers, attorneys, and auditors touted its financial prowess. Against this rose-colored backdrop, Old Dictaphone agreed to a stock-for-stock merger. The parties memorialized the terms in a merger agreement dated March 7, 2000.

The merger took place less than two months thereafter: L&H acquired all the outstanding stock of Old Dictaphone in exchange for approximately 9,400,000 shares of L&H common stock. Based on the trading price of L&H stock at the time of the closing, the exchange corresponded to a merger price of roughly $930,000,000.

As part and parcel of the transaction, Old Dictaphone merged into Dark Acquisition Corp. (Dark), a wholly-owned subsidiary of L&H created under Delaware law for the express purpose of effectuating the merger. L&H's chief executive officer, defendant-appellee Gaston Bastiaens, doubled in brass as Dark's chief executive and lone director. He also signed the merger agreement on its behalf.

Under the terms of the merger agreement, Dark inherited Old Dictaphone's assets (including any existing legal claims) and assumed

Old Dictaphone's liabilities.  This arrangement corresponded to the dictates of Delaware law.  See Del. Code Ann. tit. 8, § 259(a).  Dark survived the merger and Old Dictaphone ceased to exist.  Dark then changed its name to Dictaphone Corporation (New Dictaphone).

The honeymoon was brief.  Shortly after the merger had been consummated, L&H announced that the financial picture it had painted and displayed was not an accurate portrayal.  As matters turned out, nearly two-thirds of L&H's reported revenue from 1998 through mid-2000 had been improperly recorded, so that an apparent $70,000,000 net profit for that period was in fact a net loss of a similar magnitude.  The price of L&H shares plummeted and, on November 29, 2000, L&H and New Dictaphone filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

We fast-forward to New Dictaphone's approved plan of reorganization.  As part of that plan, the corporation conveyed its interest in any claims arising out of the merger to the Dictaphone Litigation Trust (the Trust).  That assignment galvanized this suit: acting on behalf of the Trust, the trustee filed a civil action in federal district court seeking damages to compensate for the "loss or diminution of [Old Dictaphone's] value as a going concern."

The trustee's amended complaint characterizes the gross misstatments of earnings as the mainspring of a fraudulent scheme designed to inflate the value of L&H's stock.  As the trustee envisions it, this scheme, which played out over a four-year period,

was concocted and executed by the defendants in this case (who include the officers, directors, investment bankers, attorneys, and auditors of L&H, and divers entities related to them). The fallout from it rendered worthless the consideration that Old Dictaphone and its shareholders received (assumption of Old Dictaphone's debt and shares of L&H stock).

In his amended complaint, the trustee asserts federal securities and racketeering claims, see 15 U.S.C. §§ 78j(b), 78t(a); 18 U.S.C. § 1962(c); 17 C.F.R. § 240.10b-5, as well as supplemental state-law claims for fraud, unfair trade practices, negligent misrepresentation, and conspiracy. The theory underlying each and all of these initiatives is that L&H, through its senior management, knowingly engaged in a scheme to classify research and development expenditures as fictional revenue in order to inflate the value of the company's stock. Then, knowing that they were selling a lie, L&H's hierarchs flaunted the company's ever-increasing stock price and used its apocryphal earnings to persuade Old Dictaphone and its shareholders to enter into a stock-for-stock merger. L&H relied on its investment bankers, attorneys, accountants, and related entities to substantiate its false claims; those parties, the trustee contends, knew that L&H was spinning a yarn, yet assisted it in perpetrating the fraud.[1]

---

[1]This suit comprised one of many filed in the wake of L&H's revenue restatement. In one such related action, Stonington Partners, Inc., which had owned ninety-six percent of Old

Various defendants, led by SG Cowen (an investment banking house), filed motions to dismiss. See Fed. R. Civ. P. 12(b)(6). All of these motions argued, in relevant part, that the trustee lacked standing and that his claims were barred under the in pari delicto doctrine. Some of the motions advanced additional grounds for dismissing particular claims. The trustee vigorously opposed the motions.

In due course, the district court granted Cowen's motion and dismissed the trustee's federal claims against Cowen with prejudice. See Nisselson, 2004 U.S. Dist. LEXIS 28655, at *20-21. The court rested its decision on two alternative grounds. First, it concluded that the in pari delicto doctrine barred the claims because the trustee had inherited them from New Dictaphone, an entity itself implicated in the alleged fraud. See id. at *12-15. Second, interpreting and applying the Delaware standard for distinguishing direct and derivative claims, it concluded that the trustee lacked standing because the claims asserted belonged to Old Dictaphone's former shareholders, not to Old Dictaphone itself. See id. at *15-20 (discussing, inter alia, Tooley v. Donaldson, Lufkin & Jenrette,

---

Dictaphone prior to the merger, sued for damages allegedly incurred when it traded its once-valuable interest for what ended up being worthless paper.

For his part, the trustee has brought separate actions for breach of fiduciary duty against Old Dictaphone's former directors and controlling shareholders and for breach of contract and negligence against the accountants and investment bankers who counseled Old Dictaphone during the merger negotiations.

Inc., 845 A.2d 1031, 1033 (Del. 2004)).  For the same reasons, the court, in a series of subsequent orders, granted the other appellees' motions to dismiss.[2]  This timely appeal followed.


## II.  ANALYSIS

We review Rule 12(b)(6) dismissal orders de novo, assuming the truth of all well-pleaded facts contained in the operative version of the complaint and indulging all reasonable inferences in the plaintiff's favor.  See McCloskey v. Mueller, 446 F.3d 262, 266 (1st Cir. 2006).  Facts distilled in that fashion may be augmented by reference to (i) documents annexed to it or fairly incorporated into it, and (ii) matters susceptible to judicial notice.  See Centro Medico del Turabo, 406 F.3d at 5; Rodi v. S. New Engl. Sch. of Law, 389 F.3d 5, 12 (1st Cir. 2004).  Where, as here, a district court rests its decision on alternative grounds, an appellate court need not explore both; if it determines that one such ground fully supports the order of dismissal, the court may end its deliberations at that point.  See Feinstein v. Resolution Trust Corp., 942 F.2d 34, 41 n.7 (1st Cir. 1991).

This case presents an idiosyncratic procedural feature. While most Rule 12(b)(6) motions are premised on a plaintiff's putative failure to state an actionable claim, such a motion may

---

[2]The lower court did not reach any of the additional arguments proffered by the defendants, nor do we.

sometimes be premised on the inevitable success of an affirmative defense.  See, e.g., In re Colonial Mortg. Bankers, 324 F.3d at 16; Blackstone Realty v. FDIC, 244 F.3d 193, 197 (1st Cir. 2001); Keene Lumber Co. v. Leventhal, 165 F.2d 815, 820 (1st Cir. 1948). Dismissing a case under Rule 12(b)(6) on the basis of an affirmative defense requires that "(i) the facts establishing the defense are definitively ascertainable from the complaint and the other allowable sources of information, and (ii) those facts suffice to establish the affirmative defense with certitude."  Rodi, 389 F.3d at 12.

## A.  Standing.

The district court characterized both the in pari delicto doctrine and the absence of cognizable injury as evincing a lack of standing.  See Nisselson, 2004 U.S. Dist. LEXIS 28655, at *12-13. Part of this characterization is inapt: the in pari delicto doctrine does not implicate a plaintiff's standing to sue but, rather, constitutes an affirmative defense.  See Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards, 437 F.3d 1145, 1149-50 (11th Cir. 2006); Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 157 (2d Cir. 2003); see also Baena, 453 F.3d at 6 (noting that the doctrine is, on occasion, "dubiously" referred to as implicating standing).

This does not mean, however, that we must grapple with the district court's alternative "distinct injury" holding first.  Even though challenges to a plaintiff's standing are often considered

threshold issues in federal cases, see, e.g., Pagán v. Calderón, 448 F.3d 16, 26 (1st Cir. 2006); Eulitt v. Me. Dep't of Educ., 386 F.3d 344, 351 (1st Cir. 2004), such challenges must be addressed first only if they call into question a federal court's Article III power to hear the case. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998). The constitutional prerequisites for Article III standing are satisfied so long as a plaintiff colorably alleges an actual injury that is both traceable to the defendant's conduct and redressable by a favorable decision. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-62 (1992); Ramírez v. Sánchez Ramos, 438 F.3d 92, 97 (1st Cir. 2006).

In this case, those prerequisites have been fulfilled. For purposes of their motions to dismiss, the defendants wisely choose not to contest the trustee's assertion that the conduct attributed to them resulted in a redressable injury; instead, they posit that the trustee is seeking to prosecute claims that, although cognizable in a federal court, belong exclusively to Old Dictaphone's former shareholders. The determination of who may maintain an otherwise cognizable claim turns on a question of prudential standing, not one of Article III standing. See Baena, 453 F.3d at 5; see also Ramírez, 438 F.3d at 98.

That frees our hands: Steel Co.'s ban on hypothetical jurisdiction extends only to issues involving Article III jurisdiction and, hence, Article III standing. There is no

-11-

counterpart rule that demands the resolution of objections based on prudential concerns before other issues can be adjudicated. <u>See</u> <u>Baena</u>, 453 F.3d at 5; <u>McBee</u> v. <u>Delica Co.</u>, 417 F.3d 107, 127 (1st Cir. 2005).

Mandatory rules aside, courts should not rush to rely on hypothetical jurisdiction. <u>See</u> <u>Berner</u> v. <u>Delahanty</u>, 129 F.3d 20, 23 (1st Cir. 1997). Nevertheless, one situation in which hypothetical jurisdiction, if otherwise proper, may be invoked is when doing so would avoid the need to sort out thorny jurisdictional tangles. <u>See</u>, <u>e.g.</u>, <u>McBee</u>, 417 F.3d at 127; <u>Parella</u> v. <u>Ret. Bd. of R.I. Employees'</u> <u>Ret. Sys.</u>, 173 F.3d 46, 56 (1st Cir. 1999). As we explain briefly, just such a tangle exists here.

Although the decision in <u>Tooley</u> may have helped to clarify the often elusive distinction between direct and derivative claims, that distinction remains tenebrous. <u>See</u> Richard Montgomery Donaldson, <u>Mapping Delaware's Elusive Divide: Clarification and</u> <u>Further Movement Toward a Merits-Based Analysis for Distinguishing</u> <u>Derivative and Direct Claims in Agostino v. Hick and Tooley v.</u> <u>Donaldson, Lufkin & Jenrette, Inc.</u>, 30 Del. J. Corp. L. 389, 404 (2005) (listing the "determination of who suffered the harm — the corporation or the shareholder(s)" as one of the potentially confusing issues left open under <u>Tooley</u>). More to the point, it is not immediately apparent how the Delaware court's newly announced two-part test, 845 A.2d at 1033, should apply to the unique facts of

this stock-for-stock merger. Because the record reflects a clear and sufficient basis apart from standing for affirming the district court's judgment, we bypass these uncharted waters.

## B. **The In Pari Delicto Doctrine**.

In pari delicto is both an affirmative defense and an equitable defense. Broadly speaking, the defense prohibits plaintiffs from recovering damages resulting from their own wrongdoing. See Terlecky v. Hurd (In re Dublin Sec.), 133 F. 3d 377, 380 (6th Cir. 1997). The label derives from the Latin phrase in pari delicto potior est conditio possidentis, which admonishes that "[i]n a case of equal or mutual fault . . . the condition of the [defending party] is the better one." Black's Law Dictionary 791 (6th ed. 1990).

The doctrine is grounded on twin premises. The first is that "courts should not lend their good offices to mediating disputes among wrongdoers." Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 306 (1985). The second is that "denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality." Id.

The in pari delicto defense has long been woven into the fabric of federal law. See id. at 307 (discussing the doctrine's historical development); see also Fleming v. Lind-Waldock & Co., 922 F.2d 20, 28 (1st Cir. 1990); Duncan v. Me. Cent. R. Co., 113 F. 508, 509 (C.C.D. Me. 1902). It does not make a difference that some of

-13-

the trustee's claims are premised on state law. Those claims invoke the law of Massachusetts — and the Massachusetts courts, like the federal courts, have warmly embraced the in pari delicto defense. See, e.g., Council v. Cohen, 21 N.E.2d 967, 970 (Mass. 1939); Choquette v. Isacoff, 836 N.E.2d 329, 332 (Mass. App. Ct. 2005).

As originally conceived, the in pari delicto doctrine forged a defense of limited utility. Over time, however, courts expanded the doctrine's sweep, deploying it as a basis for dismissing suits whenever a plaintiff had played any role — no matter how modest — in the harm-producing activity. See Bateman Eichler, 472 U.S. at 307. Deploring this overly commodious construction, the Supreme Court later reined in the doctrine and returned it to its classic contours. See Pinter v. Dahl, 486 U.S. 622, 635 (1988); Bateman Eichler, 472 U.S. at 310-11. This retrenchment, which governs here, restricts the application of the in pari delicto doctrine to those situations in which (i) the plaintiff, as compared to the defendant, bears at least substantially equal responsibility for the wrong he seeks to redress and (ii) preclusion of the suit would not interfere with the purposes of the underlying law or otherwise contravene the public interest. See Bateman Eichler, 472 U.S. at 311 (discussing the doctrine's application to federal securities laws); see also Edwards, 437 F.3d at 1154. Recent Massachusetts case law mirrors these refinements. See, e.g., Choquette, 836 N.E.2d at 332-33.

-14-

While the application of this binary paradigm may vary slightly depending on the nature of the particular claim asserted, courts nonetheless speak of a single doctrine. This is because the analysis ordinarily will be the same across a spectrum of different causes of action. See Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340, 345-46 (3d Cir. 2001); see also Coopers & Lybrand, 322 F.3d at 160.

The court below adopted this one-size-fits-all approach in addressing the in pari delicto defense; it neither distinguished among the various counts nor differentiated between federal and state law. The trustee has not objected to this approach, so he has waived any argument either that a claim-by-claim analysis is obligatory or that some material differences exist between applicable federal and state law. See Domegan v. Fair, 859 F.2d 1059, 1065 (1st Cir. 1988) ("It is too familiar to warrant string citation that we will not consider arguments which could have been, but were not, advanced below."). Consequently, we employ the same generic strain of the in pari delicto doctrine throughout our review.

### C. **Establishing the Appropriate Benchmark**.

To apply the requisite two-part paradigm in the circumstances of this case, we must answer a threshold question: Who, exactly, are the proper parties for the purpose of determining relative blame? The trustee's answer to this query is straightforward. Because his claims originate with Old Dictaphone,

-15-

he asseverates that this indisputably innocent party is the relevant entity for purposes of the comparison required by the binary in pari delicto test. Since Old Dictaphone was the victim rather than a perpetrator of the alleged fraud, the trustee's thesis runs, it bears less responsibility than any of the defendants and, therefore, the defendants fail to satisfy the first precondition for use of the in pari delicto defense. On that basis, the trustee claims an entitlement to recover for the injury that Old Dictaphone suffered when it was duped into proceeding with the merger.

We assume, for argument's sake, that Old Dictaphone would have been a proper party to sue for the asserted injury. See supra Part II (A). Even so, the trustee's reasoning is flawed; his analysis entirely overlooks that, pursuant to both the merger agreement and the governing law, see Del. Code Ann. tit. 8, § 259(a), upon the consummation of the merger Old Dictaphone vanished into thin air and New Dictaphone inherited all of Old Dictaphone's choses in action. Under the approved plan of reorganization incident to New Dictaphone's bankruptcy, those litigation rights were passed along once more — this time to the Trust (and, thus, to the trustee). See 11 U.S.C. § 541(a)(1). Because the lineage of the trustee's claims passes directly through New Dictaphone, any right that the trustee may have to assert those claims derives directly from New Dictaphone. This chain of descent means that the trustee — despite his protestations to the contrary — is not acting in the place and stead

-16-

of Old Dictaphone but, rather, in the place and stead of New Dictaphone.

This genealogy is important. Giving effect to it, the trustee may assert only those claims that New Dictaphone could have asserted prior to seeking the protection of the bankruptcy court. See Mediators, Inc. v. Manney (In re Mediators, Inc.), 105 F.3d 822, 826 (2d Cir. 1997); see also 11 U.S.C. § 541. After all, a trustee in bankruptcy cannot and does not acquire rights or interests superior to, or greater than, those possessed by the debtor. See Edwards, 437 F.3d at 1150; 5 Collier on Bankruptcy § 541.04 (15th ed. 2006) (noting that "nothing in section 541 [of the Bankruptcy Code, defining property of the estate] can revest a debtor with property lost prepetition" and describing property of the estate as including "causes of action").

Given the line of descent delineated by operation of the corporation and bankruptcy laws, we think that the in pari delicto defense must be available to a defendant in an action by a bankruptcy trustee whenever that defense would have been available in an action by the debtor. See Edwards, 437 F.3d at 1152; see also Baena, 453 F.3d at 7 (assessing the debtor's culpability to determine whether the in pari delicto doctrine barred a bankruptcy trustee's claims). As a necessary corollary of that proposition, there is no "innocent successor" exception available to a bankruptcy trustee in a case in which the defendant successfully could have mounted an in pari

-17-

delicto defense against the debtor.  See R.F. Lafferty, 267 F.3d at 356-57.

The explication of these principles suffices to answer the threshold question here.  Consistent with both precedent and analytic rigor, we hold that New Dictaphone is the relevant comparator vis-á-vis the defendants for the purpose of determining the viability of the latter's in pari delicto defense.  Old Dictaphone's innocence is irrelevant to that inquiry.

### D.  **Applying the Paradigm**.

Having determined that New Dictaphone is the entity of interest for purposes of the required comparison, we move to the question of what actions can, at this stage of the proceedings, be imputed to it (and, thus, to the trustee).  See Baena, 453 F.3d at 7.  In an effort to mount a preemptive strike, the trustee posits that because all imputation inquiries entail fact-specific determinations, an in pari delicto defense that relies on imputed conduct cannot be adjudicated on a motion to dismiss.  Although the trustee's premise is partially correct — the extent to which fraudulent conduct can be implied depends heavily on the specific facts of a given case — he casts the net too wide.

The reporters are replete with examples of fact-dominated questions, normally grist for the jury's mill, that may appropriately be resolved by a motion filed pursuant to Rule 12(b)(6).  See, e.g., Epstein v. C.R. Bard, Inc., 460 F.3d 183, 188

-18-

(1st Cir. 2006); Rodi, 389 F.3d at 16. The key is whether the factual scenario, as pleaded, is clear enough to permit peremptory resolution of the dispositive issue. See Rodi, 389 F.3d at 16 (explaining that when the facts alleged in the complaint preclude a finding in the plaintiff's favor on a particular claim or defense, "a court may enter an order of dismissal under Rule 12(b)(6)"). When a case hinges on imputation and the pleaded facts, construed in the light most flattering to the resisting party, dictate imputation, a court is free to decide that question on a motion to dismiss. See, e.g., Baena, 453 F.3d at 8 (affirming dismissal on in pari delicto grounds after imputing fraudulent conduct to debtor corporation); Coopers & Lybrand, 322 F.3d at 164; (noting that the court historically "has affirmed the dismissal of . . . claims on the pleadings upon findings that in pari delicto had been established in the complaints"); Terlecky, 133 F.3d at 380 (affirming dismissal when the debtor "admit[ted] in his complaint that the debtor's own actions were instrumental in perpetrating the fraud").

We look to state law to ascertain when wrongful conduct should be imputed to a corporation. See O'Melveny & Myers v. FDIC, 512 U.S. 79, 84 (1994); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Nickless (In re Advanced RISC Corp.), 324 B.R. 10, 14 (D. Mass.

-19-

2005).[3]  Here, the case law leaves little doubt that Massachusetts law governs the imputation calculus.  See O'Melveny & Myers, 512 U.S. at 83-85 (emphasizing the importance of the substantive law of the state in which the causes of action arose, rather than the law of the state of incorporation, to determine imputation).

Under Massachusetts law, a parent and its wholly-owned subsidiary are generally regarded as separate and distinct entities. See United Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp., 960 F.2d 1080, 1091 (1st Cir. 1992); Berger v. H.P. Hood, Inc., 624 N.E.2d 947, 950 (Mass. 1993).  Courts may, however, disregard the corporate form when doing so will defeat a fraud practiced by those who control the subsidiary corporation.  See My Bread Baking Co. v. Cumberland Farms, Inc., 233 N.E.2d 748, 751 (Mass. 1968). Relatedly, the fraudulent conduct of persons or entities who exercise complete control over a corporation may be imputed to the corporation when those actors have used the corporation as a vehicle for facilitation of the fraud.  See, e.g., Consove v. Cohen (In re

---

[3]To the extent that the trustee's claims are premised on federal statutes, we arguably have discretion to use federal common law, as opposed to state law. See O'Melveny & Myers, 512 U.S. at 84 (explaining that where a particular cause of action arises under a federal statute, a federal court, for this purpose, writes on a pristine page).  Even so, license to apply a uniquely federal test is not tantamount to mandating such a test.  Mindful that two of our sister circuits recently have opted for state-law tests of imputation in connection with federal claims, see Edwards, 437 F.3d at 1149; R.F. Lafferty, 267 F.3d at 358, and that no party to this litigation has requested us to fashion federal common law, we use Massachusetts jurisprudence as the yardstick for measuring imputation across the board.

Roco Corp.), 701 F.2d 978, 984 (1st Cir. 1983) (applying Massachusetts law and imputing fraudulent conduct of individual who, "as the company's president, director, and sole shareholder, . . . was in a position to control the disposition of its property"); Merrill Lynch, 324 B.R. at 14-15 (applying Massachusetts law and imputing principals' fraudulent conduct to debtor corporation where the relationship was "one of complete control"); Demoulas v. Demoulas, 703 N.E.2d 1149, 1171 (Mass. 1998) (applying Massachusetts law and denying bona fide purchaser status to a corporation, under an imputation theory, when the "sole voting trustee of 100 percent of the [corporation's] stock" had actual knowledge of adverse claims against the purchased property).

With this backdrop in place, the trustee's remaining arguments against imputing L&H's fraudulent conduct to its wholly-owned subsidiary lack force. The trustee himself has observed that in pari delicto cases often result in imputation of fraudulent conduct to a corporation when those responsible for the scheme are "the sole decision-maker[s] for such entity, exercising complete control over its management." Appellant's Br. at 43 n.21. This observation accurately reflects the case law. See, e.g., Coopers & Lybrand, 322 F.3d at 164-65 (imputing fraudulent conduct to debtor when complaint established that its controlling shareholders "dominat[ed] and controll[ed] the corporation" and were responsible for "orchestrat[ing] the fraudulent conduct"); R.F. Lafferty, 267

-21-

F.3d at 359-60 (imputing fraudulent conduct to debtor corporation and dismissing trustee's case on in pari delicto grounds where the individuals masterminding the fraud were the debtor's sole shareholders); Merrill Lynch, 324 B.R. at 14-16 (dismissing trustee's action on in pari delicto grounds when debtor corporation was formed by the defrauders for the express purpose of carrying out the fraudulent plan). Since New Dictaphone, not Old Dictaphone, is the proper focal point of our imputation inquiry, see supra Part II (C), this case fits snugly within that integument. We explain briefly.

Here, the amended complaint leaves no doubt but that L&H played the primary role in contriving the scheme to acquire Old Dictaphone under false pretenses. The amended complaint also establishes that L&H created New Dictaphone (née Dark) for the express purpose of furthering this artifice. L&H's control over New Dictaphone during the course of the scheme is indisputable. In addition to owning all of New Dictaphone's stock, L&H installed its president, Bastiaens, as New Dictaphone's chief executive officer and sole director. Bastiaens, in turn, ensured New Dictaphone's complicity in the fraud's climactic event when he executed the merger agreement on its behalf.

These uncontroverted facts are telling. Because the amended complaint shows beyond hope of contradiction that L&H created and controlled New Dictaphone in order to perpetrate the

harm-producing fraud, we have no principled choice but to impute its conduct to New Dictaphone for the purpose of applying the in pari delicto paradigm. See Merrill Lynch, 324 B.R. at 15; Demoulas, 703 N.E.2d at 1172; My Bread Baking, 233 N.E.2d at 751.

The trustee tries to find sanctuary by pointing out that, after the merger, the directors of Old Dictaphone (presumably innocent) became directors of New Dictaphone. This datum does not alter our conclusion. The first prong of the in pari delicto inquiry focuses on "the unlawful activity that is the subject of the suit." Pinter, 486 U.S. at 636. Accordingly, a party's culpability vel non must be based on its status at the time the alleged illegality occurred. See Baena, 453 F.3d at 10 (finding no Massachusetts case law supporting a theory that in pari delicto is in any way modified when "prior management was at fault but the claim [is] asserted on behalf of creditors or shareholders").

Here, of course, the fraud that underpins the trustee's claims was complete at the moment the companies merged. Therefore, any post-merger changes in New Dictaphone's corporate governance or management are beside the point. Simply put, bankruptcy trustees do not have access to an "innocent successor" exception as a way of shielding themselves from the operation of an in pari delicto defense. See R.F. Lafferty, 267 F.3d at 356-57; see also Baena, 453 F.3d at 10.

The trustee's next attempt to elude the toils of the in pari delicto doctrine involves the well-recognized adverse interest exception. Generally, a wrongdoer's fraudulent acts will not be imputed to a corporation when the wrongdoer is acting contrary to the corporation's present interests. See, e.g., Baena, 453 F.3d at 8 (listing looting as a "classic example" of adverse conduct); Sunrise Props., Inc. v. Bacon, Wilson, Ratner, Cohen, Salvage, Fialky & Fitzgerald, P.C., 679 N.E.2d 540, 543 (Mass. 1997) (concluding that "unauthorized acts [should] not [be] imputed to the principal when the agent has acted fraudulently toward the principal"). Endeavoring to squeeze within these narrow confines, the trustee contends that L&H's scurrilous conduct is tantamount to looting because L&H convinced Old Dictaphone to surrender its assets for worthless paper.

This contention is ill-conceived, for the trustee's sights are trained on the wrong entity. Accepting the allegations of the amended complaint as true, L&H's actions were adverse to Old Dictaphone and its shareholders — but they were not adverse to New Dictaphone (a corporate shell which, in effect, was in league with the defrauder and as a result received something for nothing). Since we already have determined that New Dictaphone, not Old Dictaphone, is the focal point of the imputation inquiry, see supra Part II (C), the adverse interest exception does not apply.

The trustee has yet another string to his bow. He argues that even if New Dictaphone is the proper focal point of an in pari delicto analysis, the adverse interest exception precludes us from imputing L&H's fraud to its subsidiary because New Dictaphone was "entirely indifferent" about whether Old Dictaphone received fair value for its assets or whether L&H used skulduggery to effect the acquisition. Appellant's Reply Br. at 19. We find this argument unpersuasive. In our view, mere indifference is insufficient to show adversity. The adverse interest exception applies only to those whom the fraud has disadvantaged. See Restatement (Second) of Agency § 282(1) (explaining that the exception attaches only when an agent secretly acts adversely to his principal). In this instance, the allegations of the amended complaint make manifest that New Dictaphone benefitted from the fraud: it was the surviving entity in a merger that netted it over $900,000,000. New Dictaphone, as a beneficiary of L&H's chicanery at the time the fraud was consummated,[4] cannot rely on the adverse interest exception to avoid imputation. After all, a party cannot accept the avails of fraudulent conduct without also bearing responsibility for

---

[4]Because the adverse interest exception turns on how the alleged wrongdoing affected the immediate interests of the party who seeks its shelter, New Dictaphone's subsequent implosion is of no moment. See Baena, 453 F.3d at 7; accord Beck v. Deloitte & Touche, Deloitte, Haskins & Sells, Ernst & Young, L.L.P., 144 F.3d 732, 736 (11th Cir. 1998) (applying Florida law); Cenco Inc. v. Seidman & Seidman, 686 F.2d 449, 456 (7th Cir. 1982) (applying Illinois law).

that conduct.  See Tremont Trust Co. v. Noyes, 141 N.E. 93, 98 (Mass. 1923).

To summarize succinctly, L&H was the main player in the alleged fraud and its parlous behavior must be imputed lock, stock, and barrel to its offspring (New Dictaphone).  It follows inexorably that New Dictaphone, in contemplation of law, bears at least as much responsibility for the asserted wrongdoing as any of the defendants.[5]  Hence, the moving defendants have satisfied the first requirement for establishing an in pari delicto defense.

We move next to the second requirement.  As said, this prong implicates public policy concerns.  The trustee contends that allowing the defendants to hide behind the in pari delicto doctrine would frustrate the purpose of the securities laws because it would allow participants in a fraudulent scheme to shield themselves from liability.  This contention is wide of the mark.

As we have pointed out, the trustee is not bringing claims on behalf of an innocent target of the fraud but, rather, on behalf

_____

[5]As a fallback, the trustee suggests that the relevant comparison entails matching New Dictaphone's culpability against the culpability of L&H.  That suggestion is faulty.  When deciding whether to recognize an in pari delicto defense, an inquiring court must consider whether the party alleging injury (here, the trustee, who stands in the shoes of New Dictaphone) bears substantially equal (or greater) responsibility as the party or parties asserting the defense (here, the defendants).  See Bateman Eichler, 472 U.S. at 306 (emphasizing the relative culpability of the "[defending] party" as compared to the plaintiff (alteration in original)).  L&H is not a defendant in this action.

-26-

of a complicit party. Viewed in that light, the trustee's policy concerns ring hollow.[6] See Edwards, 437 F.3d at 1155 (finding public policy exception inapplicable in analogous circumstances).

The trustee also asserts that withholding application of the in pari delicto doctrine would promote the goal of "discourag[ing] wrongdoers from engaging in future fraudulent schemes and violations of the securities laws." Appellant's Br. at 38. That resupinate reasoning turns reality on its head. To permit the trustee to proceed in these circumstances would be equivalent to giving New Dictaphone a second bite at the cherry, allowing it first to reap the benefits of the fraud and then to attack the defrauders. The securities laws were enacted to protect investors from deceptive practices, see Pinter, 486 U.S. at 638, not to give the intended beneficiaries of deceptive practices a back-door means of ensuring a profit.

Finally, the trustee strives to persuade us that we should repel the defendants' in pari delicto defense because, in the absence of that defense, the creditors of Old Dictaphone ultimately would receive the fruits of any recovery. We find this argument unconvincing; despite the interposition of the in pari delicto

---

[6]In all events, dismissing the claims at issue here will not allow the defendants to escape unscathed. The amended complaint and matters susceptible to judicial notice reveal that many of the defendants are facing or have faced not only criminal charges but also a myriad of other civil suits relating to their respective roles in the alleged fraud.

defense, the creditors remain free to proceed in their own right, untainted by New Dictaphone's role in the alleged wrongdoing. See Edwards, 437 F.3d at 1151; Terlecky, 133 F.3d at 380; Merrill Lynch, 324 B.R. at 16.

This arrangement is especially preferable because the Trust beneficiaries may well include parties (most notably L&H) who were themselves complicit in the underlying fraud. If we were to suspend the operation of the in pari delicto defense in this case, creditors with unclean hands would profit equally with innocents. If, however, each creditor must proceed by individual suit, the righteous may recover while the tainted, unable to circumvent the in pari delicto bar, will be hoist by their own petard.

At oral argument, the trustee insisted that the alternative of direct suits by creditors is illusory because creditors lack contractual privity with the investment bankers, lawyers, and accountants who comprise the trustee's targets. Thus, the argument runs, if we afford these targets the safe haven of an in pari delicto doctrine, creditors will be completely foreclosed from accessing those pockets that are deep enough to compensate them at anything higher than pennies on the dollar.

This jeremiad is unavailing. Even assuming that the trustee's premise is true — and we have some doubt about its validity — the equities are not nearly so clear-cut. First, the creditors (or the trustee, on their behalf) may well succeed in

suits against Old Dictaphone's former directors, controlling shareholder, and outside accounting professionals. See supra note 1. Second — and more important — our holding today breaks no new ground. As such, the potential for default under these circumstances is something about which creditors had notice — something that should have been priced into their decisions to extend credit. Equity does not require courts to provide a belt when creditors had fair warning that they ought to have purchased suspenders.

## III. CONCLUSION

To summarize, we conclude that uncontroverted facts sufficient to establish the in pari delicto defense are definitively ascertainable from the amended complaint and other allowable sources of information. These include L&H's creation of New Dictaphone for the express purpose of effectuating the fraud-inspired merger and its exercise of complete control over New Dictaphone until the fraud was consummated. In these circumstances, L&H's conduct must be imputed to New Dictaphone. Consequently, New Dictaphone shares the culpability of the fraud's progenitor and, as such, bears as much or more responsibility for the wrongdoing as any of the named defendants. In the absence of any compelling public policy reason to allow New Dictaphone to seek damages from those that assisted in executing the fraudulent scheme — and the trustee has identified none — the in pari delicto doctrine precludes New Dictaphone (and,

hence, the trustee) from advancing the type of claims that are at issue here.

We need go no further.  For the reasons elucidated above, we hold that the district court did not err in dismissing the trustee's amended complaint.

**<u>Affirmed</u>**.