# United States Court of Appeals

## For the First Circuit

No. 06-2103

FRANK U. WETMORE,

Plaintiff-Appellant,

v.

MACDONALD, PAGE, SCHATZ, FLETCHER & COMPANY, LLC,

Defendant-Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, United States District Judge]

Before

Howard, Circuit Judge,
Selya, Senior Circuit Judge,
and Shadur,* Senior District Judge.

James T. Kilbreth, with whom Peter S. Black and Verrill Dana,
LLP were on brief, for appellant.

Bruce W. Hepler, with whom Laurence H. Leavitt and Friedman,
Gaythwaite, Wolf & Leavitt were on brief, for appellee.

February 12, 2007

_____

*Of the Northern District of Illinois, sitting by designation.

**SHADUR, <u>Senior District Judge</u>**.  This diversity action was brought in the United States District Court for the District of Maine in February 2006 by Frank Wetmore ("Wetmore") against Macdonald, Page, Schatz, Fletcher & Co., LLC ("Macdonald Page"), a Maine limited liability company none of whose members shares Wetmore's Massachusetts citizenship.  Wetmore's complaint alleges that Macdonald Page committed professional negligence, breach of contract and negligent misrepresentation when it appraised a business in which Wetmore was a shareholder for less than half its actual value.

When Macdonald Page moved to dismiss the action under Fed. R. Civ. P. ("Rule") 12(b)(6), a magistrate judge recommended granting its motion, and the district court then upheld that recommendation.  Wetmore has filed a timely appeal challenging the dismissal.

## STANDARD OF REVIEW

As taught in such cases as <u>Epstein</u> v. <u>C.R. Bard, Inc.</u>, 460 F.3d 183, 187 (1st Cir. 2006):

> We review a Rule 12(b)(6) dismissal <u>de novo</u>, considering all well-pleaded facts in the complaint to be true.

That familiar principle adheres to the seminal teaching of <u>Conley</u> v. <u>Gibson</u>, 355 U.S. 41, 45-56 (1957) that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of

his claim which would entitle him to relief."  To that end, in addition to the acceptance of all well-pleaded allegations and all reasonable inferences from those allegations as well, Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006) explains:

> Facts distilled in that fashion may be augmented by reference to (i) documents annexed to it [the complaint] or fairly incorporated into it, and (ii) matters susceptible to judicial notice.

## BACKGROUND

Wetmore's complaint concerns the sale of his stock in Portland Shellfish Company, Inc. ("Company"), a Maine-based close corporation whose chief business is processing live shellfish.  As one of the two owners, Wetmore held 300 voting and 150 non-voting shares of Company stock, while the remaining 300 voting shares were held by Donna Holden.  Ms. Holden's husband Jeff (hereafter simply "Holden") served as President of the Company and managed its daily operations, including production, procurement and sales.

Under the Company's Shareholders' and Officers' Agreement ("Agreement," attached to the complaint as an exhibit), the Company's board of directors was restricted to two members: Wetmore and Holden.  By late 2001 number of disagreements had arisen between Wetmore and the Holdens over the management and direction of the Company.  After unsuccessful efforts to resolve those differences, the Holdens invoked the deadlock-breaking provision of Agreement §11.5.5:

> In the event the operations of the Company are impaired because of deadlock on the board of directors, the shareholders agree that they shall each have the right to acquire the other shareholder's stock, as follows. In the event of a deadlock, the directors shall hire an accountant at MacDonald Page & Co., South Portland, Maine, to determine the value of the outstanding shares. Once the value is reported to the directors by the accountant, the directors shall call a meeting, each shareholder shall have the right to buy out the other shareholder(s)' interest, at a price equal to or greater than the price determined by the accountant. The highest offer made by any shareholder at the meeting shall be binding upon the other shareholder(s). The shareholder who is acquiring the stock shall be required to close on the acquisition within 90 days of the meeting of the shareholders.

In accordance with that provision, Wetmore and the Holdens retained Macdonald Page to evaluate the Company's shares by identifying the fair market value of a 100% common equity interest. In its engagement letter Macdonald Page defined "fair market value":

> The price at which the property would change hands between a willing buyer and a willing seller, neither being under a compulsion to buy or sell and both having reasonable knowledge of relevant facts.

As called for by the Agreement and Macdonald Page's engagement letter, it delivered its valuation report to the Company, estimating "the fair market value of the common stock of [the Company] at June 30, 2002, to be approximately $1,090,000." Ms. Holden then offered to purchase Wetmore's shares at a price equal to 60% (Wetmore's proportionate share) of Macdonald Page's valuation. Wetmore, however, resisted that offer and countered by offering $1.25 million for Ms. Holden's shares if Holden would sign

a non-compete agreement. Alternatively Wetmore offered to join in selling the Company to a third party.

In response the Holdens rejected both of Wetmore's offers. Ms. Holden insisted that Wetmore was obligated to sell his shares pursuant to Agreement §11.5.5, stating that she would sue if he refused. Facing the threat of litigation, Wetmore sold his shares to Ms. Holden for $750,705, a price that represented 60% of the Macdonald Page evaluation after adjustment to eliminate a 7% "marketability discount" included in Macdonald Page's report.

As stated at the outset, Wetmore's Complaint asserts that Macdonald Page's valuation "was well less than half the actual value" of the Company's total stock, which Wetmore attributes to factors including Macdonald Page's disregard for "commonly accepted and reliable methods of valuation in favor of less reliable methods." More specifically, Count I charges professional negligence, Count II charges breach of contract and Count III charges negligent misrepresentation.

## REQUIRED ELEMENTS OF PROOF

All three of Wetmore's claims stem from the common law--two sound in tort, one in contract. And all three were found wanting by the district court based on its determination that Wetmore would be unable to prove causation, a critical element in

each.[1]

Thus <u>Graves</u> v. <u>S.E. Downey Land Surveyor, P.A.</u>, 885 A.2d 779, 782 (Me. 2005)(emphasis added) instructs that "[t]he plaintiff in a professional negligence action must establish the appropriate standard of care, demonstrate that the defendant deviated from that standard, and prove that the deviation <u>caused</u> the plaintiff's damages." Similarly, <u>Maine Energy Recovery Co.</u> v. <u>United Steel Structures, Inc.</u>, 724 A.2d 1248, 1250 (Me. 1999)(emphasis added) identifies the required elements of proof in a breach of contract action as comprising "(1) breach of a material contract term; (2) <u>causation</u>; and (3) damages." Finally, <u>Chapman</u> v. <u>Rideout</u>, 568 A.2d 829, 830 (Me. 1990) holds that Maine recognizes the tort of negligent misrepresentation as defined in Restatement (Second) of Torts, §552(1) (1977)(emphasis added)):

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss <u>caused</u> to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

With all other components of each of Wetmore's theories of recovery plainly being met by his complaint's allegations, the central issue on this appeal is whether Wetmore's well-pleaded

---

[1] Throughout this opinion we look to the substantive law of Maine, which Agreement §15 designates as providing the rules of decision.

facts support a claim that Macdonald Page's negligent valuation caused him to receive less than fair market value for his shares. We turn to that question.

**CAUSATION ELEMENT**

As we have said in <u>Napier</u> v. <u>F/V Deesie, Inc.</u>, 454 F.3d 61, 68 (1st Cir. 2006), "[i]n order for the negligent act to constitute proximate cause, the act or omission must be a substantial factor in bringing about the harm and the injury incurred must have been a reasonably foreseeable consequence."[2] <u>Merriam</u> v. <u>Wanger</u>, 757 A.2d 778, 780-81 (Me. 2000) has put the same concept in these terms:

> Evidence is sufficient to support a finding of proximate cause if the evidence and inferences that may reasonably be drawn from the evidence indicate that the negligence played a substantial part in bringing about or actually causing the injury or damage and that the injury or damage was either a direct result or a reasonably foreseeable consequence of the negligence. The mere possibility of such causation is not enough, and when the matter remains one of pure speculation or conjecture, or even if the probabilities are evenly balanced, a defendant is entitled to judgment.

Notably, <u>Merriam</u> does not insist that a defendant's conduct must be the <u>only</u> cause of the harm--instead it must have contributed substantially to the harm suffered. We therefore look to the question whether under the facts as pleaded a reasonable jury could conclude that Macdonald Page's negligence was a

---

[2] Although <u>Napier</u> was a case sounding in admiralty, its stated principles of proximate causation are universally applied.

-7-

substantial factor in Wetmore's recieving less than the full market value of his shares.

According to the district court, Wetmore cannot establish causation because "[n]othing in the Agreement or in the other factual allegations of the complaint required the plaintiff to accept Donna Holden's offer." Instead "[a]ll he had to do was offer her the same amount or more per share for her shares than she had offered him for his." It was the district court's view that the deadlock provision required Wetmore to accept Ms. Holden's offer only if and when he determined that he was unwilling to offer more money per share to purchase her stock. Through the district court's lens Wetmore "had many options, ranging from challenging the appraisal in any of a number of ways to offering Donna Holden the same amount per share to offering her more per share."

In that light the district court ultimately held that Macdonald Page's valuation was not and could not have been a cause, substantial or otherwise, of Wetmore's loss. We disagree.

Under the Agreement the parties, in the event of a deadlock, were required to hire Macdonald Page in what would be the first step in potentially resolving the stalemate. It was Macdonald Page's role to provide a valuation that the parties would use to begin a bidding process. As the plain language of the Agreement put it, the purpose of the Macdonald Page valuation was "to determine the value of the outstanding shares" so that at the

ensuing shareholders' meeting "each shareholder shall have the right to buy out the other shareholder(s)' interest, at a price equal to or greater than the price determined by the accountant" (emphasis added). In brief, Macdonald Page's figure was to serve as a floor--the lowest possible bid. To say that a negligently-arrived-at valuation that set an artificially low floor would not have a substantial effect on a shareholder in Wetmore's position ignores the logic of cause and effect.

Importantly, Wetmore was under no compulsion to enter the active bidding process. If for any reason he felt himself unable to compete on a level playing field after acquiring total ownership of the Company (it will be remembered that the Holdens would be free to engage in the same business post-sale, with Holden having the operating experience that Wetmore lacks), he had the absolute right to accept Ms. Holden's offer so long as it equaled or exceeded Macdonald Page's valuation figure. And that meant he had the right to rely on Macdonald Page to generate a valuation that set a fair price for the shares.

Instead, under the allegations of the complaint that must be accepted as gospel for present purposes, Macdonald Page improperly promulgated a figure that was less than half the true value of Wetmore's shares. To be sure, Wetmore could have responded by offering Ms. Holden more for her shares, but being limited to that route deprived him of the full benefit of his

bargain by foreclosing his opportunity to sell at a fair price. Once Macdonald Page rendered its negligent undervaluation of the Company, it was too late--indeed, impossible--for Wetmore to choose to exercise that equally absolute right. Wetmore's allegations thus offer far more than "pure speculation or conjecture" (Merriam, 757 A.2d at 781) as to Macdonald Page's improper valuation being a substantial factor in Wetmore's asserted loss.

It should be added that Wetmore's injury was entirely foreseeable. What Macdonald Page's alleged misfeasance imposed on Wetmore was precisely the type of bind that shareholders in a close corporation seek to avoid when they include buy-sell provisions in their agreements. Protections afforded by buy-sell provisions that set a bidding floor are fully meaningful only if the initial valuation of the company is performed accurately. Otherwise, as here, the distortion of that base valuation skews the entire process.

In this instance the parties selected a buy-sell provision that would have been evenhanded if the valuation had been properly arrived at. By contrast, it is entirely foreseeable that a shareholder who receives an improperly low bid based on a negligently-reached valuation will suffer a loss based on the undervaluation of his or her shares. And here Macdonald Page's engagement letter expressly confirmed its own understanding that its valuation would play a key role in the bidding process:

> We understand that our valuation conclusion will be used in conjunction with the Company's "Shareholder's and Officer's Agreement" dated February 1, 1994, paragraph 11.5.5....

To argue that Wetmore's loss was not foreseeable would be disingenuous, given that plain language confirming Macdonald Page's duty to the Company's shareholders.

In its decision the district court also reasoned that if Macdonald Page's valuation had been higher, there is no guaranty that Ms. Holden would have made an offer. We too lack an unclouded crystal ball to tell us what would have transpired had the valuation been performed without negligence. There are multiple possibilities, including the prospect that an unsuccessful bidding process might for example have led the parties to resolve their differences, breaking their deadlock, or might instead have led to the invocation of Maine's statutory provision for the resolution of corporate deadlocks. But such speculation plays no part in the determination at the pleading stage whether Wetmore has stated a cognizable claim--he clearly has. We emphasize that there are many factual questions and matters of proof that remain unresolved, but those will require a more developed record--they simply are not before us at the Rule 12(b)(6) stage.

## CONCLUSION

For the reasons that have been stated here we REVERSE the district court's dismissal of Wetmore's complaint and REMAND for further proceedings consistent with this opinion.